## Meyer v. Industrial Valley Bank & Trust Company

*Louis J. Goffman* and *H. Robert Freibach*, for plaintiff.

*Bernard J. Smolens*, for defendant.

KELLEY, J., February 3, 1967.—Plaintiff instituted an action in replevin to obtain bonds that he pledged with defendant as security for a loan. Following a trial by jury, a verdict was rendered for plaintiff for the return of his bonds or their equivalent in money.

On June 25, 1957, plaintiff, Milford J. Meyer, at the suggestion of his friend, Max E. Cohen, signed an agreement with defendant, Industrial Valley Bank & Trust Company, wherein Meyer agreed to pledge certain collateral to Industrial to secure a loan which Industrial would make to Cohen. Both Cohen and Meyer were attorneys. The agreement, signed in blank, on a form drafted by Industrial, is as follows:

"Philadelphia, Penna. 6/25 1957
"TO INDUSTRIAL TRUST COMPANY:
"I hereby declare that_____has my full consent to pledge____shares of_____with Industrial Trust Company as collateral for any loan to_____and that so long as said securities may remain in the custody of said Industrial Trust Company, I expressly ratify and agree in advance to any and all agreements which said_____ may make with Industrial Trust Company regarding the use of said collateral for any loans to_____ and I expressly authorize said Industrial Trust Company to sell said securities at public or private sale in accordance with the terms of any note which said _____may give to represent_____loans, and hereby agree to save said Industrial Trust Company harmless and indemnified forever against any result which may follow such action.

Milford J. Meyer /s/

"Witness at signing:
"Robert W. Godfrey /s/"

Meyer signed this agreement at the direction and in the presence of Samuel Weinrott, then an executive of Industrial, and now president of Industrial. At that time, he personally handed Weinrott 1,500 shares of Sheraton Corporation. Meyer did this as a favor to Cohen and received no compensation for pledging his securities.

Subsequently, Industrial loaned money to Cohen, retaining the Sheraton shares as collateral for the loan.

In early September 1958, Meyer called Weinrott and asked if he could replace his Sheraton stock with 1,000 shares of McQuay-Norris stock. Weinrott agreed to this exchange. Accordingly, this transaction occurred on September 9, 1958, when Cohen turned over to Industrial the McQuay-Norris stock of Meyer and at the same time picked up the Sheraton stock.

On September 23, 1958, Meyer replaced the McQuay-Norris stock with 20 $1,000 Pennsylvania Turnpike bonds, bearer in form. He delivered these bonds personally to Weinrott and personally received from Weinrott a receipt for the bonds. Weinrott requested Meyer to sign the bank's ledger card "Max E. Cohen by Milford J. Meyer" to acknowledge Meyer's receipt of the McQuay-Norris stock, and this Meyer did.

Coupons on the bonds came due semiannually. Cohen or his agent would deliver these coupons, as they became due, to Meyer in an envelope bearing Industrial's letterhead. Such procedure was not done at the direction of Meyer but "just as a matter of course".

On July 25, 1962, $5,000 in bonds were released by Industrial and delivered to Meyer by an attorney from Cohen's office. Cohen previously informed Meyer that he had reduced the loan and had arranged for the release of the bonds.

On February 21, 1963, Industrial made demand on Cohen for the balance of his loan, which was $8,000, to be paid on or before March 14, 1963. Meyer was not advised of the demand.

After receiving the demand notice from Industrial, Cohen went to Girard Trust Company and negotiated a loan. Girard issued its check to Industrial in the amount of $8,104.63, including interest, and received the bonds directly from Industrial on March 11, 1963. Industrial released the bonds to Girard according to a letter of authorization from Cohen to Industrial to do so.

Cohen died on March 20, 1965. About two weeks thereafter, Meyer phoned Weinrott and asked about the status of the Cohen loan. Weinrott informed him that there was no loan and that the bonds had been turned over to Girard Trust Company to secure a loan to Cohen from Girard.

Meyer then made a demand for payment on both

Girard and Industrial. Prior to that, Cohen during his lifetime had increased his loan at Girard to $12,500, and had given his note for that amount in replacement of the earlier note of $8,000, the proceeds of which had been used to pay off his obligation to Industrial. Subsequent to Meyer's demand, Industrial paid off Cohen's obligation to Girard, delivering its check for $12,935.43, which included principal and accumulated interest. In exchange, Industrial received Meyer's bonds, together with the note for $12,500, on which note, by special endorsement, Girard advised Industrial that it could not guarantee anything regarding the bonds or note.

Meyer, with one exception, continued to receive the interest coupons as they became due, in envelopes bearing the Industrial letterhead, even after the bonds had been delivered by Industrial to Girard. The exception was that Meyer, on one occasion, received a check drawn on Industrial to the order of Cohen and endorsed to Meyer, representing interest due on the bonds, when the bonds were no longer in the custody of Industrial. This payment was for interest on a coupon which had been overlooked when it had become due, while the bonds were in the custody of Industrial.

Despite the fact that Industrial had within its files the pledge agreement, and the further fact that the president of the bank had given its receipt for the bonds to Meyer personally, the loan officer in the commercial department testified that he was unaware of these facts when he transferred the bonds and accepted payment from Girard.

Meyer never authorized anyone to give his bonds to Cohen, to Girard, or to anyone else, and he was in ignorance of all transactions between Cohen, Girard and Industrial.

The threshold question is: whose function is it to construe the contract? We hold, and the parties below

agree, that the court rather than the jury should construe the meaning of the pledge agreement: Thommen v. Aldine Trust Co., 302 Pa. 409, 418 (1931). We further hold that to submit the interpretation of the contract to the jury, as was done in the instant case, was harmless error, because the jury interpreted the contract as does the court: Schneider v. Girard Trust Bank, 420 Pa. 636 (1966) (per curiam).

The contract herein created a suretyship relation: Restatement, Security §§36 and 83, provide as follows:

"§36  Owner of Pledged Chattel as Surety.

"(1)  Where a pledge is made as security for the obligation of a third party, the pledgor is a surety to the extent of the pledged chattel.

"(2)  Where a third person authorizes the pledge of his chattel to secure the obligation of a pledgor and this fact is known to the pledgee, the owner of the chattel is a surety to the extent of the pledged chattel. . . .

"§83  Creation of Suretyship.

"The suretyship relation is created where the surety . . .

"(b)  secures, or permits the principal to secure with the surety's property, the performance of the principal's duty to the creditor. . . ."

In the comment to the last mentioned clause, it states:

"A common example of this form of suretyship is where the surety pledges bonds or share certificates to the creditor or lends them to the principal so that he can pledge them to the creditor."

Both parties are agreed that a suretyship relationship was created. Both parties are also agreed that the surety is discharged if there was payment of the principal obligation or if there was a material alteration of the surety contract without consent of the surety.

We hold that the surety was discharged, because there was both (1) payment of the principal obligation which was secured, and (2) a material alteration of the suretyship contract without knowledge or consent of the surety.

It is fundamental that a surety is discharged by payment of the principal debt: Restatement, Security §115, provides:

"(1) Where the duty of the principal to the creditor is discharged by performance by the principal or by another on his behalf, the obligation of the surety is also discharged".

A case very similar to the instant case is that of Leeds v. Perpetual Building and Loan Assn., 61 Pa. Superior Ct., 551-52, 542 (1915), where the court held:

"When, by payments and the sale of the appellee's property under his own mortgage, without any deductions for the surrender value of his stock, appellee's debt was paid in full, the purpose for which appellee's stock was pledged was fully accomplished. The stock should have been returned to him in kind".

On March 11, 1963, when Industrial received a check issued by Girard Trust in the exact amount of the outstanding loan balance owing from Cohen, Cohen's indebtedness to Industrial was paid. Meyer thereupon became entitled to repossession of his bonds from Industrial.

Industrial attempts to avoid this result by characterizing the transaction between Cohen, Girard and Industrial as something other than a payment of Cohen's obligation to Industrial. It contends that the payment by Girard to Industrial of the amount of Cohen's obligation and the delivery of Cohen's note to Girard did not discharge plaintiff's suretyship obligation, but that the same indebtedness continued and only the form of the evidence of that debt was changed.

When Cohen became indebted to Girard, there was no obligation owing by Cohen to Industrial. Industrial had no rights against Cohen or Meyer. The books of account of Industrial reflect this. When Meyer called Weinrott, shortly after Cohen's death, to inquire as to the status of Cohen's loan, Weinrott informed him there was no loan outstanding. Such evidence is admissible as tending to establish an estoppel: Kaufmann v. Friday, 201 Pa. 178 (1902).

Industrial also erroneously contends that, by his pledge agreement, Meyer agreed in advance that defendant could enter into a transaction such as was consummated between Cohen, Girard and Industrial. Accordingly, it urges that the Cohen-Girard-Industrial transaction was not a material alteration of the surety contract.

In construing the pledge agreement, this court is mindful of the normal rules of construction that a writing is interpreted as a whole, that an interpretation which gives a reasonable, lawful and effective meaning to all manifestations of intention is preferred to an interpretation which leaves a part of such manifestations unreasonable, unlawful or of no effect, and, finally, that where words bear more than one reasonable meaning, an interpretation is preferred which operates more strongly against the party from whom they proceed: Restatement, Contracts §§235(c), and 236(a) and (d). Apart from these secondary rules of construction, the norm by which a contract is interpreted is:

". . . the meaning that would be attached . . . by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with (it) . . . other than oral statements by the parties of what they intended it to mean": Restatement, Contracts §230.

At the outset, the court derives some comfort from the fact that 12 jurors interpreted the contract as it does. The contract is concise and nontechnical. A person shorn of any raiment of legal training is perhaps the best judge of what this contract means. Moreover, our interpretation is reinforced by the fact that defendant, Industrial, in preparing the pledge agreement, expressly included a clause granting it the power to sell.

Whether or not there was a material alteration of the contract turns on the interpretation of the clause "so long as said securities may remain in the custody of said (defendant) . . . I expressly ratify and agree in advance to any and all agreements which said Max E. Cohen may make with (defendant) . . . regarding the use of said collateral for any loans to Max E. Cohen". Industrial argues that this language is an advance ratification of Meyer to the action taken by Industrial when they transferred Meyer's bonds to Girard. It relies on the fact that when the "agreement" to transfer was made, Industrial possessed the collateral.

The meaning of the contract is that Meyer's advance assent operated only as long as the bonds remained in Industrial's custody; the agreement contemplated continued retention by Industrial and applied only to loans made to Cohen by Industrial.

Industrial's interpretation renders nugatory the condition of retention. For if one were to take defendant's interpretation to a logical conclusion, Meyer agreed that Industrial and Cohen might contract with a loan shark of a criminal syndicate as long as Industrial did not give up possession of the collateral prior to consummating such a transaction. The rule cited by the Supreme Court is:

" '. . . where a contract as a whole shows a given intention but certain words or phrases if taken liter-

ally will defeat such intention . . . the particular words or phrases will, if possible, be construed in such a way as to be consistent with the general intention'": Pennsylvania Turnpike Commission, to use, v. U. S. Fidelity & Guaranty Co., 343 Pa. 543 (1942).

Having rejected Industrial's interpretation of the contract, the next query is whether the transfer of the collateral is a material alteration within the interpretation ascribed to the contract by the court.

Meyer undertook this obligation without compensation and thus has the status of a gratuitous surety. The law is clear that a material alteration or variation of surety agreement without consent of the gratuitous surety discharges his obligation: Plummer v. Wilson, 322 Pa. 118 (1936).

Although the cases interchangeably use the term "alteration" to mean a modification as well as an interlinear alteration, we will refer to the action complained of herein as an alteration of the surety contract.

In support of his argument that the unauthorized delivery was a material alteration of the contract, Meyer argues that such act constituted a conversion. We deem it unnecessary to determine whether Industrial's actions amounted to a conversion in order to decide the question of whether there was a material alteration of the contract. Suffice it to say that the contract was breached and that the surety was materially prejudiced thereby; he no longer has his principal to indemnify him or help pay off the loan. For examples of material alterations, see Spring Garden Building and Loan Association v. Rhodes, Trustee, 126 Pa. Superior Ct. 102 (1937) (cancellation of stock and issuing stock in a new series, where said stock was collateral security for payment of a loan); First National Bank and Trust Company v. Stolar, 130 Pa. Superior Ct. 480 (1938) (bank subordinating

its judgment lien on which the surety was liable to its mortgage lien covering same realty without consent or knowledge of surety, discharged surety from liability on the judgment).

Apart from the contract of suretyship, Industrial urges that Meyer clothed Cohen with authority to deal with the collateral as his own and that Industrial was justified in transferring the collateral, pursuant to Cohen's authorization. In support of this position, Industrial contends that Cohen picked up all interest coupons when they came due semiannually and that, on one occasion, he obtained $5,000 of principal and turned it over to Meyer. These facts, as a matter of law, did not justify Industrial in assuming Cohen had authority to deal with these securities: Plunkett and Murray v. Raniszewski, 108 Pa. Superior Ct. 506 (1933) (collection of all interest and three payments of principal); Kienberger v. Lally, 130 Pa. Superior Ct. 583 (1938) (collection of all interest and two payments of principal). The extent of the duty of inquiry of one dealing with an apparent agent in this situation was amply set forth by the Supreme Court in Browne v. Hoekstra, 279 Pa. 418 (1924):

". . . we desire to admonish those who deal with agents claiming to be authorized to receive the principal of mortgages, that the mere possession of the mortgage papers is not sufficient to establish agency, and to call attention to the fact that a mortgagor before paying his indebtedness to an agent can fully protect himself by demanding the exhibition of a power of attorney authorizing receipt of the principal or by inquiry from the mortgagee as to whether payment to the agent is authorized.": Id., page 424.

See also Restatement, Agency 2d §71.

Industrial cannot rely on the doctrine of apparent authority when its own witness, Joseph Morris, testified he acted pursuant to Cohen's authorization to re-

lease the collateral in ignorance of Meyer's ownership of the bonds. The evidence shows that Industrial never relied on the apparent authority of Cohen. Principles of apparent authority apply only when action is taken in reliance upon facts giving rise to apparent authority: Restatement, Agency 2d §8, comment a.

As a final plea, Industrial urges upon the court that to discharge the surety and return his securities is inequitable. This is so, it claims, because the debt of Cohen remains. It also argues that Meyer is in no different position now than when the securities were transferred to Girard, and that it, Industrial, took over the loan from Girard and that Meyer has no cause to complain that his position was worsened by the transfer to Girard.

There is an equitable maxim that where one of two innocent persons must suffer loss by reason of the fraud of another, the loss must fall on him by whose act the wrongdoer has been enabled to commit the fraud. The loan officer of defendant bank should have been aware of the pledge agreement and the fact that Meyer was the owner of the bonds.

The nub of this case is whether Industrial can reassert the claim it originally had against the pledged collateral. What defendant here aimed to do is analogous to what was unsuccessful in Bernstein v. Hineman, 86 Pa. Superior Ct. 198 (1925). There, plaintiff placed his truck in defendant's garage for repairs but refused or neglected to pay the repair bill. Defendant sold plaintiff's truck to a third party who, in turn sold it to another party. When defendant learned that his sale was unlawful, he immediately repurchased the truck. Plaintiff demanded his truck from the defendant, alleging conversion of his property. Holding that defendant's unqualified sale discharged his lien and

that plaintiff was entitled to his property, the court stated:

"The defendant supposed he had a right to sell the property to secure his claim and proceeded on that theory. This amounted to a conversion. In the operation, he secured the payment of the bill he had against the plaintiff and it cannot be successfully contended that his subsequent acquisition of the property restored the claim to life. . .": Id. page 201.

Defendant Industrial cannot make the chain "like new" once a link has been broken.

The contentions of defendant relating to its motion for a new trial are based on its position that the applicable law is different than that which has been stated heretofore. Its arguments having been unpersuasive on its motion for judgment n.o.v., we find no merit in the same arguments when advanced on its motion for a new trial.

## ORDER

And now, February 3, 1967, defendant's motion's for a new trial and judgment n.o.v. are denied. The prothonotary is directed to enter judgment on the verdict.